UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MAXIMILIANO DIAZ PEREZ et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil No. 25-13129-LTS |
| MARDER TRAWLING, INC., et al., | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTIONS TO COMPEL ARBITRATION (DOC. NOS. 48, 53)
<u>AND PLAINTIFFS' MOTION TO STRIKE (DOC. NO. 68)</u>

July 10, 2026

SOROKIN, J.

Plaintiffs are five low-wage workers who bring this lawsuit on behalf of themselves and

other persons similarly situated against Marder Trawling, Inc., a seafood processing plant located

in New Bedford, and Workforce Unlimited, Inc., Marder's staffing agency.  They also bring

individual claims against Marder's former plant manager, Francisco Ixcotoyac Dionicio, and

Workforce's President, Andrew Wilke.  Pending before the Court are two motions to compel

arbitration: one filed by Workforce and Wilke ("Workforce Defendants") and one by Marder.

Doc. Nos. 48, 53.[1]

While the substance of Plaintiffs' allegations is not directly at issue for resolving the

pending motions, the Court summarizes the factual background as alleged in the complaint.  At

---

[1] Citations to "Doc. No. __" reference items filed on the electronic docket ("ECF") in the action that is the subject of this Order; pincites are to the page numbers in the ECF header or, where applicable, to the paragraph numbering within the document.

all relevant times, workers at Marder's seafood processing facility were either (1) directly hired and paid by Marder, or (2) jointly employed by Workforce and Marder and paid by Workforce. Doc. No. 1 ¶¶ 18-22.  Maximiliano Diaz Perez ("Marder Plaintiff") was hired in the former manner, while the remaining Plaintiffs—Lorenzo Suar Panjoj, Maria Lucrecia Tzampop Gomez, Yohangly Mishell Garcia Mendez, and Maily Adriana Velasquez Morales ("Workforce Plaintiffs")—were employed in the latter manner.  Id. ¶¶ 8-12.  Regardless of how the workers were employed, they all worked side by side at Marder's facility under the control of Marder and its supervisors, including Ixcotoyac.  Id. ¶¶ 19, 21.  Plaintiffs allege all workers were subjected to an extorted kickback scheme, wherein they were forced to make weekly cash payments of approximately $100 to Ixcotoyac as a condition of their employment.  Id. ¶¶ 1, 36, 42.  The complaint also alleges that workers who resided in Rhode Island were required to pay Defendants approximately $60 per week to be transported to Marder's facility.  Id. ¶ 30.  Based on these and related allegations, Plaintiffs filed suit against Defendants on October 24, 2025, advancing claims under the Fair Labor Standards Act ("FLSA"), the Massachusetts Wage Act, and other Massachusetts employment laws.  Subsequently, Plaintiffs submitted the signed notices of twenty individuals who joined the case as opt-in plaintiffs pursuant to Section 216(b) of the FLSA.  Doc. Nos. 28-46, 59.

On January 23, 2026, Workforce Defendants moved to compel arbitration of Workforce Plaintiffs' claims, citing six arbitration agreements those Plaintiffs signed during their

onboarding process with Workforce.[2]  Doc. No. 48.[3]  On February 5, 2026, Marder separately

moved to compel arbitration of Workforce Plaintiffs' claims, Doc. No. 53, based on its theory

that it is a third-party beneficiary to Workforce's arbitration agreements (or alternatively, that it

is entitled to invoke the arbitration agreements under the doctrine of equitable estoppel), Doc.

No. 54 at 10-13.[4]  Plaintiffs filed a consolidated opposition to both motions, Doc. No. 63, and

Workforce Defendants replied.  Doc. No. 67.  As part of their reply, Workforce Defendants

attached four additional arbitration agreements (one signed by Suar and three signed by Garcia)

that they had not previously disclosed or attached to their opening brief.[5]  See Doc. Nos. 67-1 to

-2.  Upon obtaining leave to do so, Plaintiffs filed a sur-reply.  Doc. No. 74.

   Plaintiffs also moved to strike the four additional arbitration agreements attached to

Workforce Defendants' reply.  Doc. No. 68.  Workforce Defendants opposed, Doc. No. 72, and

Plaintiffs replied, Doc. No. 74.  The Court held a hearing on the pending motions to compel

arbitration and motion to strike on July 6, 2026.  For the reasons that follow, the Court DENIES

---

[2] The six agreements are as follows: (1) an arbitration agreement signed by Suar dated September 14, 2023; (2) an arbitration agreement signed by Suar dated July 21, 2025; (3) an arbitration agreement signed by Tzampop dated October 21, 2025; (4) an arbitration agreement signed by Garcia dated March 29, 2024; (5) an arbitration agreement signed by Velasquez (under the moniker "Marleny Lopez") dated April 29, 2024; and (6) an arbitration agreement signed by Velasquez dated May 27, 2025.  Doc. No. 49-1 at 17-39.

[3] Workforce Defendants also move to dismiss Marder Plaintiff's claims against them for failure to state a claim.  Doc. No. 49 at 15-16.  However, Plaintiffs explain in their opposition that Marder Plaintiff does not allege any claims against Workforce Defendants.  Doc. No. 63 at 33-35.  Therefore, Workforce Defendants' motion to dismiss Marder Plaintiff's claims is DENIED AS MOOT, and the record shall reflect the binding concession from Marder Plaintiff that he asserts no claims against Workforce Defendants.

[4] Marder's motion does not encompass Marder Plaintiff.  During the motion hearing held on July 9, 2026, Marder represented that it does not anticipate moving to compel arbitration of Marder Plaintiff's claims.

[5] The reply attaches: (1) an arbitration agreement signed by Suar dated November 5, 2025 (Doc. No. 67-1 at 2-5); (2) an arbitration agreement signed by Garcia dated April 29, 2024 (Doc. No. 67-2 at 2-4); (3) an arbitration agreement signed by Garcia dated October 30, 2025 (id. at 5-7); and (4) an arbitration agreement signed by Garcia dated December 29, 2025 (id. at 8-10).

WITHOUT PREJUDICE Defendants' motions to compel.  Plaintiffs' motion to strike is DENIED AS MOOT.

## I.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") reflects a "liberal federal policy favoring arbitration" and "the fundamental principle that arbitration is a matter of contract."  AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (citation modified).  "Thus, courts must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms."  Id.  Nonetheless, the FAA's "liberal policy favoring arbitration is only triggered when the parties actually agree to arbitrate."  Air-Con, Inc. v. Daikin Applied Latin Am., LLC, 21 F.4th 168, 174 (1st Cir. 2021) (citation modified).  "The court's first step in determining whether to compel arbitration is to identify a valid and enforceable agreement to arbitrate between the parties."  Id.  "The party seeking to compel arbitration bears the burden of demonstrating that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope."  Id. (citation modified).  State contract law governs whether a valid arbitration agreement exists.  Rivera-Colon v. AT&T Mobility P.R., Inc., 913 F.3d 200, 207 (1st Cir. 2019).

The First Circuit applies a summary-judgment standard to motions to compel under the FAA.  Air-Con, 21 F.4th at 174.  Thus, courts evaluating motions to compel "must construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  Id. at 175.

## II.    DISCUSSION

Before examining whether the parties formed valid agreements to arbitrate, the Court begins by addressing two issues raised by Plaintiffs that do not bear on the arbitrability of their

4

claims but rather concern the enforceability of certain terms of the arbitration agreements.  First, Plaintiffs contend that the arbitration agreements are unconscionable because their provision requiring each party to bear its own costs and fees contravenes the fee-shifting requirements of the relevant wage laws.  Doc. No. 63 at 26-28.  That provision of the arbitration agreement states: "The cost of the arbitrator will be paid for by Workforce.  Each participating party will be responsible for its own attorney and other related fees."  Doc. No. 49-1 at 11.  In response, Workforce Defendants contend that this provision merely means "the parties are responsible for their own attorneys' fees *during the arbitration*," and that "there is nothing in the agreement that prohibits the arbitrator from awarding successful plaintiffs all relief available under the Wage Act or the FLSA, including liquidated damages and attorneys' fees."  Doc. No. 67 at 9.  They further note that, "[s]hould the arbitrator conclude that a plaintiff prevails on a Wage Act or FLSA claim, attorneys' fees and costs may be reimbursed in accordance with those statutes."  Id. In light of Defendants' binding concession, Plaintiffs' argument about the fee provision is not a basis for challenging the enforceability of the arbitration agreements.

Second, the Court rejects Plaintiffs' contention that the entire arbitration agreement should be set aside because of its provision restricting the limitations period of all claims to one year.[6]  As an initial matter, the Court agrees that the one-year limitations period set forth in the arbitration agreement is invalid and unenforceable.  With respect to Plaintiffs' FLSA claims,

---

[6] The relevant provision of the arbitration agreement states:

> Workforce and EMPLOYEE agree that any claim, administrative claim or lawsuit relating to EMPLOYEE's service with Workforce, or assignment to work at Worksite Employer, must be filed no more than one (1) year after the date of the employment action that is the subject of the claim or lawsuit. Workforce and EMPLOYEE waive any statute of limitations to the contrary.

Doc. No. 49-1 at 9.

federal courts have "routinely disallowed arbitration provisions shortening the limitations period" for FLSA claims. Crespo v. Kapnisis, No. 21-cv-6963-BMC, 2022 WL 2916033, at *6 (E.D.N.Y. July 25, 2022). This is because under the FLSA, a "claim accrues each time an employer issues a deficient paycheck." Hackler v. R.T. Moore Co., No. 17-cv-262-FtM-29-MRM, 2017 WL 6535856, at *3 (M.D. Fla. Dec. 21, 2017). "Thus, the statute of limitations period has a direct correlation to the amount of recovery that an employee is entitled to obtain, and has been described as being both procedural and substantive." Id. As a result, shortening the limitations period for bringing FLSA claims amounts to an improper waiver of substantive rights under the FLSA. Boaz v. FedEx Customer Info. Servs., Inc., 725 F.3d 603, 606-07 (6th Cir. 2013). The same logic applies to Plaintiffs' claims under the Massachusetts Wage Act and the Massachusetts Minimum Wage Law. Like FLSA claims, those statutory claims accrue with each violative paycheck; thus, truncating the limitations period for those state-law claims amounts to an improper waiver of substantive rights.

That leaves Plaintiffs' claim under the Massachusetts Temporary Workers Right to Know Law ("TWRTK"). In relevant part, that law requires a staffing agency to provide notice to employees of "details of the means of transportation to the worksite and any fees charged to the employee by the staffing agency or worksite employer for any transportation services." Mass. Gen. Laws ch. 149, § 159C(b)(6). The complaint alleges that Workforce violated this law by failing to provide notice to Plaintiffs about the accurate costs of transportation. Doc. No. 1 ¶¶ 134-137. Plaintiffs argue that shortening the limitations period for this claim is invalid because it "would be perverse to allow Workforce to avoid liability for violations of law because they failed to provide mandated notice about such rights." Doc. No. 63 at 24. While the Court is aware of no case law addressing shortened limitations periods for TWRTK claims, public policy

6

counsels against abbreviating the statute of limitations for such claims.  The manifest purpose of a "Right to Know" law is to equalize informational asymmetry and ensure that individuals receive notice of their rights.  Here, Defendants allegedly failed to provide the legally mandated notice under the TWRTK and made Workforce Plaintiffs sign arbitration agreements further limiting their ability to vindicate their rights.  Under such circumstances, curtailing Plaintiffs' limitations period for bringing their TWRTK claims subverts the policy aims emanating from the statute.

Nevertheless, the Court's finding that the one-year limitations period is invalid does not nullify the arbitration agreement in its entirety.  The arbitration agreement contains a severability clause, which states: "If any provision of this Agreement is determined to be invalid or illegal by a court or authority of competent jurisdiction, no other provision of this Agreement shall be affected thereby, and each other provision shall remain in full force and effect."  Doc. No. 49-1 at 11.  Because the one-year limitations period can be neatly severed from the arbitration agreement without infecting the rest of the agreement, the Court finds that this provision does not preclude the enforceability of the arbitration agreement.  See Machado v. System4 LLC, 28 N.E.3d 401, 415 (Mass. 2015) ("[I]f we were to find any of the discussed provisions unconscionable, the franchise agreements contain a severability clause, requiring any unenforceable term to be severed.").  Should the Court order arbitration in this matter, it intends to sever the provision shortening the limitations period.

With those preliminary issues resolved, the Court turns to whether Workforce Plaintiffs and Workforce Defendants formed valid agreements to arbitrate.  In arguing that valid contracts were formed, Workforce Defendants primarily rely on the affidavit of Workforce's Human Resources Director, Ana Sanchez, which summarizes the company's general process for

executing onboarding paperwork, including the arbitration agreement.  Doc. No. 49-1.  Sanchez explains that prospective employees who arrive at Workforce's office "are given all onboarding documents and are then shown to a space in [the] office where they can sit at a table and review all of the onboarding documents."  Id. ¶ 11.  Prospective employees are instructed to fill out the documents and told that they can direct any questions to Sanchez or another Human Resources employee.  Id. ¶¶ 11, 17.  They are also "given as much time as they would like to complete the onboarding documents" and "allowed to take the documents home with them to review."  Id. ¶ 12.  The arbitration agreements are provided in both English and Spanish.  Id. ¶¶ 8-9.  If any prospective employee discloses difficulty reading or writing in either language, a Human Resources employee is available to sit with them and verbally go over the documents.  Id. ¶ 14.

Plaintiffs tell a different story.  In their affidavits, Workforce Plaintiffs explain that during the onboarding process, a Workforce representative flipped through a stack of documents and pointed at where to sign without explaining what the documents stated.  Doc. No. 63-1 ¶ 8; Doc. No. 63-2 ¶¶ 5, 11; Doc. No. 63-3 ¶¶ 11, 16; Doc. No. 63-4 ¶¶ 10, 14.  They state that they were not provided with copies of the documents and did not have an "opportunity to review" them.  Doc. No. 63-1 ¶¶ 8, 9; Doc. No. 63-2 ¶¶ 5, 11, 14; Doc. No. 63-3 ¶¶ 12, 16, 18; Doc. No. 63-4 ¶¶ 11, 14-15.  As a result, they were not aware that they were executing agreements to arbitrate their claims against Workforce.  Doc. No. 63-1 ¶ 9; Doc. No. 63-2 ¶¶ 11-14; Doc. No. 63-3 ¶¶ 13, 18; Doc. No. 63-4 ¶¶ 12, 14.

Workforce Plaintiffs further explain that they signed the agreements because they believed they would lose their jobs if they did not do so.  Doc. No. 63-1 ¶ 9; Doc. No. 63-2 ¶ 12; Doc. No. 63-3 ¶¶ 13, 17; Doc. No. 63-4 ¶¶ 12, 14.  They also point to the coercive work environment preceding the onboarding process.  Doc. No. 63 at 20.  More specifically, Tzampop

reports that, on the second day of the job, Ixcotoyac "came up to [her] and told [her] to come with him to fill out some paperwork so [she] could get [her] check." Doc. No. 63-2 ¶ 3. The other three Workforce Plaintiffs state that they were directed to fill out the onboarding paperwork by Ixcotoyac after they had already been victimized by his extortion scheme. Doc. No. 63-1 ¶¶ 3-7; Doc. No. 63-3 ¶¶ 6-10; Doc. No. 63-4 ¶¶ 4-9.

Under Massachusetts law, "[t]he appropriateness of enforcing an agreement to arbitrate an [employment] claim hinges on whether, under the totality of the circumstances, the employer's communications to its employees afforded 'some minimal level of notice' sufficient to apprise those employees that continued employment would effect a waiver of the right to pursue the claim in a judicial forum." Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 555 (1st Cir. 2005) (quoting Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 21 (1st Cir. 1999)). An employer can satisfy this burden by showing that, "under the totality of the circumstances, the employer's communication would have provided a reasonably prudent employee notice of the waiver." Id. "Factors relevant to this analysis include, but are not limited to, the method of communication, the workplace context, and the content of the communication." Id.

Here, the totality of the facts raised by Plaintiffs sparks meaningful questions about whether Workforce Defendants provided Workforce Plaintiffs with sufficient notice of the arbitration agreements, as required for valid contract formation. In their reply, Defendants do not directly dispute any of Plaintiffs' asserted facts.[7] Accordingly, the Court finds that

---

[7] Instead, Workforce Defendants contend that at least some of the issues raised by Plaintiffs can be resolved by enforcing the later-signed agreements that they attach to their reply. The Court declines, however, to convert a motion to compel arbitration pursuant to one set of contracts into one pursuant to a different set of contracts that Workforce Defendants disclosed to the other side and the Court for the first time in a reply.

Defendants have not established that they are entitled to arbitration under the applicable summary-judgment standard.  At the same time, the Court acknowledges that the present record leaves open questions about the precise circumstances under which Workforce Plaintiffs signed the arbitration agreements—even when construing the record and drawing all reasonable inferences in Plaintiffs' favor.  While Workforce Plaintiffs assert that they signed the agreements without having an "opportunity" to review them, their affidavits do not contain specific facts explaining this lack of opportunity.  For example, Workforce Plaintiffs do not claim that the onboarding personnel prevented them from seeing the arbitration agreements, denied their requests to read the documents, or limited their time to sign the agreements.  And in the Spanish version of the agreements (which is the version signed by each Workforce Plaintiff), a summary of the agreement to arbitrate was provided in bolded, all-caps lettering directly above the signature line.  Doc. No. 49-1 at 15.

Given the foregoing factual issues surrounding the execution of the arbitration agreements, the Court DENIES WITHOUT PREJUDICE Defendants' motions to compel and DENIES Plaintiffs' motion to strike AS MOOT.  Within seven days, the parties shall submit a joint status report articulating their joint or separate positions for a schedule governing the following three topics as well as any other topics for which a party believes the Court should establish a schedule:

1. **Renewed motions to compel arbitration.**  Should they wish to renew their motion to compel arbitration, Workforce Defendants shall file one motion encompassing every Workforce Plaintiff and opt-in plaintiff they wish to compel.  Along with their motion, Workforce Defendants must produce a copy of every arbitration agreement that they intend to enforce as well as any evidence offered in support of their motion.  Marder may

also renew its motion to compel arbitration as to Workforce Plaintiffs (as well as any opt-in plaintiffs employed by Workforce) under the third-party beneficiary theory or the doctrine of equitable estoppel.  Plaintiffs' opposition to such motions shall similarly attach any evidence upon which they wish to rely.  The parties may rely upon their existing briefs with supplements only to the extent necessary to address any new issues or evidence.  The Court anticipates holding an evidentiary hearing on any renewed motion to compel if necessary to resolve factual determinations.

2. **Amended complaint.**  If Plaintiffs wish to submit an amended complaint, they shall propose a deadline for filing the amendment.  The parties shall note the impact the amended complaint may have, if any, on the timing of any renewed motions to compel.

3. **Marder plaintiffs.**  The Court understands that the claims of Marder Plaintiff and any opt-ins who were solely employed by Marder ("Marder Opt-Ins") will not be subject to any future motion to compel.  The Court does not anticipate staying the claims of these individuals even if the claims of other plaintiffs are sent to arbitration.  Accordingly, the parties shall provide their joint or separate proposals on how to proceed with the claims of Marder Plaintiff and Marder Opt-Ins.

III.   <u>CONCLUSION</u>

For the foregoing reasons, the motions to compel, Doc. Nos. 48, 53, are DENIED WITHOUT PREJUDICE.  The motion to strike, Doc. No. 68, is DENIED AS MOOT.  The parties shall file a joint status report within seven days as directed by this Order.

SO ORDERED.

  /s/ Leo T. Sorokin
United States District Judge

11